TIERNEY v. McKAY.

1. PARTNERSHIP—LEGAL OBLIGATIONS OF PARTNERS AS TO THIRD PARTIES NOT AFFECTED BY PRIVATE AGREEMENT.
   Private agreements between partners could not change the law (2 Comp. Laws 1915, § 6355) requiring the filing of a certificate with the county clerk, or relieve either of his obligation under a lease or the partnership, as to third parties.[1]

---

[1]Partnership, 30 Cyc. p. 392.
232—Mich.—39.

2. FORFEITURE—NOT FAVORED BY LAW.

>The law does not favor forfeitures, provisions for them are to be strictly construed, and to sustain them the proof must be clear and convincing.[2]

3. LANDLORD AND TENANT — SALE BY ONE PARTNER TO ANOTHER NOT A BREACH OF COVENANT AGAINST ASSIGNMENT.

>Where partners executed a lease as individuals, they were tenants in common with right to possession as such, and therefore a sale of his interest in the business conducted in said premises by one partner to the other was not a breach of the provision against assigning the lease or subletting the premises.[3]

Error to Bay; Houghton (Samuel G.), J. Submitted April 22, 1925. (Docket No. 27.) Decided December 22, 1925.

Summary proceedings by Harry J. Tierney against Max McKay and another. There was judgment of restitution, and defendants appealed to the circuit court. Judgment for defendants on a directed verdict. Plaintiff brings error. Affirmed.

*H. J. Gaffney* and *John E. Kinnane*, for appellant.

*B. J. Henderson*, for appellees.

STEERE, J. This case was commenced May 3, 1924, by summary proceedings before a circuit court commissioner to recover possession of the basement and first floor of a store building described as 702 Washington avenue, Bay City, Michigan, on the ground of forfeiture of a lease under which defendants had possession. Plaintiff owned the property and on July 31, 1918, rented the described part of it to defendants for a period of ten years, beginning September 1, 1918, under a written lease at an annual rental, payable in monthly instalments, of $1,400 for the first five years, and $1,500 for the second five

---

[2]Landlord and Tenant, 35 C. J. § 232; [3]Id., 35 C. J. § 67.

years' period.    The premises were "to be used by the lessees as optometrists and manufacturing opticians." The lease also provided that—

"said lessees shall not assign this lease or let or underlet said premises or any part thereof, nor use the same or permit the same to be used for any other purpose than as above described, * * * without the written consent of said lessor." * * *

Prior to making this lease defendants had been engaged as partners at another stand in Bay City in the same line of business as they leased plaintiff's store for, and had filed a proper certificate of partnership with the clerk of Bay county certifying to the firm name as McKay Brothers "doing business as the Bay City Optical Company," giving the full names and addresses of the two brothers as "copartners" and providing that "said partnership is to continue indefinitely."

Defendants took possession of the premises on obtaining the lease and established their optical business there.    They continued it together as before until some time the following year when by mutual agreement Pingree McKay withdrew and started an optical business in Lansing called the "P. H. McKay Optical Parlors."    He remained there in charge of that business for from four and one-half to five years when, in February, 1924, he sold it, returned to Bay City and took over the old business under an agreement to purchase from his brother, Max McKay, who during his absence had continued to run the Bay City optical business in the store they had leased from plaintiff, in the same manner and under the same firm name as before, regularly paying the monthly instalments of rent as provided for in their lease by checks of "McKay Brothers," which plaintiff accepted, indorsed and cashed.    He identified Exhibit A, for $125, "dated February 1, 1924," signed "McKay Brothers, Max McKay," and Exhibit B, for $125,

dated "May (March?) 3, 1924" signed "McKay
Brothers, by P. H. McKay" as checks made payable
to and accepted by him for payments of those months'
rent.

Plaintiff testified that when Pingree went to Lansing
in 1919 Max told him he had bought Pingree out en-
tirely and was the sole owner of the business, that he
accepted it as true "and from that time on dealt
with Max as tenant of the premises." The last two
checks he accepted were Exhibit A, and Exhibit B,
which he indorsed and received the money on. Ex-
hibit A was paid through the bank February 5, 1924,
and Exhibit B, on March 5, 1924, as shown by the
bank cancellation stamp on the back.

Plaintiff testified that he did not know of the change
of ownership until after accepting those checks, and
when tendered the rent for April he refused to accept
it, as he had then been told by Pingree that he had
bought Max out and claimed the right to continue
under their lease. Having "obtained first-hand in-
formation from the brothers" as each sold to the other,
he said he then "figured they were both out" and
"claimed a forfeiture of the lease" on that ground.
He states he had no difficulty otherwise with defend-
ants and made no claim "but that the brothers paid
their rent promptly and everything of that kind."

His notice of forfeiture, dated April 23, 1924, is
addressed to "Mr. Pingree H. McKay," describes the
lease dated July 31, 1918, between himself "and Max
McKay and Pingree H. McKay, lessees," and declares
the same forfeited, concluding:

"That by reason of the assignment of said lease and
letting and underletting said premises, to wit: To
Pingree H. McKay, said lease has become forfeited
and the same is hereby terminated and immediate
possession of said premises is hereby demanded."

On trial before the circuit court commissioner he

sustained plaintiff's contention, found defendants guilty of unlawfully withholding possession of the premises and entered an order of restitution in plaintiff's behalf. Retrial was had in the circuit court before a jury on defendants' appeal resulting in a judgment on directed verdict in their favor. Plaintiff's basic contention is comprehensively stated in his counsel's brief as follows:

—"that the action of Pingree McKay in selling out and removing to a distant city in 1919 worked a dissolution of the partnership of McKay Brothers, and that when he returned to Bay City five years later and bought out the business, he was a stranger to it, and that the selling out of the business to Pingree and putting him in possession as proprietor had the same effect as selling to a stranger, viz., forfeiture of the lease."

Plaintiff's assignments of error are centered on the charge of the court in directing a verdict for defendants, and particularly against the ruling of the court "in unreasonably restricting cross-examination of defendants as to the transaction between Pingree McKay and Max McKay at the time Pingree left the business in 1919." Though many material facts were undisputed, the indicated attitude of the defense was to concede nothing and object to everything. Their counsel announced early in the trial, "We won't concede anything." In introducing testimony to establish his case, plaintiff's counsel first called in succession defendants Max and Pingree McKay for examination under the statute so authorizing. They proved to be far from frank and were palpably hostile witnesses, given to evasive answers and resorting repeatedly to "I don't remember" when confronted with inconsistencies in their testimony. During their examination their counsel was prolific in objections, many of them to clearly legitimate questions on cross-examination of a hostile and evasive witness. Both testified that

when Pingree went to Lansing to go into business there he went out of the Bay City business. Max bought him out and took it over, with its responsibilities and obligations, but both clung to the claim they yet remained partners and the purpose of their cross-examination was directed to the contrary. They said the change was by mutual agreement and when asked if that agreement was in writing made at that time both replied that it was. When asked to produce it both answered that it was lost or destroyed, they could not find it and could not produce it, attributing their lack of accurate memory of its contents to lapse of time. When Max was asked to tell what he could recall of it he replied:

"It was drawn up to set forth the change in status between Ping's business relations and mine, his relations as an optometrist, if I remember.

"*Q.* It provided that hereafter you would conduct the business in Bay City, and be the owner of it?

"*A.* I wouldn't say that; I would conduct it, and I did.

"*Q.* Did he have any interest in it?

"*A.* Yes, sir.

"*Q.* What was his interest in it?

"*A.* I decline to answer that.

"*Mr. H*— I object to that as incompetent, immaterial and irrelevant.

"*The Court:* I don't think it material. * * *

"*Q.* Now, to get to 1924, you say you cannot and will not tell us anything in the agreement of dissolution?

"*Mr. H*— I object to that question.

"*The Court:* The objection is sustained.

"*Q.* You say you refuse to tell us anything that you know was in that?

"*Mr. H*— Same objection.

"*The Court:* Sustained. The matter has been disposed of for the present. * * *

"*Q.* Did you have anything to do with the management of his business in Lansing during that time?

"*A.* I would say I did.

"*Q.* What connection did you have with it?

"*Mr. H*— I object to that as incompetent, immaterial and irrelevant.

"*The Court:* Sustained."

Referring to the time when Pingree returned from Lansing, plaintiff's counsel asked him: "Then in 1924, in February, he made an agreement with you in writing, and you have been asked to produce it? *A.* Yes, sir." Defendants' counsel then interposed an argumentative objection, saying in part:

—"there was some things about these brothers' private affairs this landlord had no right or business in this case to enter into. I am perfectly willing to submit this agreement to the court, but I submit counsel is not entitled to see it; it is not admissible in evidence in this case and has nothing to do with it."

He then passed the agreement up to the court and after looking it over the court said he saw no serious objection to the defendants' counsel seeing it and allowed them to do so. The only matter in it which does not bear more or less on a purchase and sale of the Bay City optical business, by Max to Pingree, is that "both parties agree to each donate $25 per month towards the support of our mother as long as she lives."

Plaintiff's counsel early pronounced this agreement a "questioned document" and proceeded to examine Max in regard to it, interrupted by frequent objections of defendants' counsel and restrictive rulings of the court applied mostly to questions imputing a sinister motive in preparing the agreement for the purposes of defense. Plaintiff's counsel offered the instrument in evidence and it was marked as "Exhibit 2." The court expressed the opinion that some of it was material and said, "As to other matters I don't think it is at all material." Plaintiff's counsel then said, "I think we will let it rest, as to putting it in at the present time." The court appears to have assumed thereafter that it was in evidence and it was printed

as an exhibit in the record.   The instrument, dated February 21, 1924, is a well prepared contract of conditional sale of Max's interest in the business to Pingree, with customary provisions requiring the purchaser to keep the stock of goods up to its present standard and quality, carry insurance upon the same sufficient to protect both parties, the seller not to engage in the same line of business in Bay City, etc. It provides for four deferred annual payments to the seller of $5,000 each, the first to be made on or before August 1, 1924, and when said payments, amounting to $20,000, are completed "the said business will be and become the sole and individual property of said Pingree," who "is to have the active management and control of said business, which is to be conducted under the firm name and style of McKay Brothers." Defendants' most persuasive objection to its admission was based on the fact that the agreement makes no mention of any lease, while plaintiff's objection to it as a questioned document is apparently directed against its import that the partnership and mutual interest of the brothers in the business yet existed and would continue until the last deferred payment was made.

Early in the trial of the case when objections and rulings blocked legitimate cross-examination of defendants, as was claimed, plaintiff's counsel declared their attitude and efforts in that direction to be, "We have to get the business away from McKay Brothers into Max, and then from Max back to Pingree again." If that were the test of forfeiture plaintiff had ample testimony to carry that issue to the jury, both by defendants themselves and the testimony of other witnesses as to what defendants had told them at different times about buying out each other's business interest; but in analyzing the case the trial court in effect assumed these propositions of fact to be true

as above stated by counsel, but held as a proposition of law that there was no competent written or oral evidence sustaining the claim that Pingree by severing his connection with the business in 1919 also parted with his legal interest and obligations under the lease or that the same was forfeited by the conditional sale of Max's interest in the business to Pingree in 1924, the conclusions of the court based on the properly proven facts as found were summed up in the charge as follows:

"We find this situation, that the lease was originally made by the owner to the two McKay boys, the defendants in this case, to conduct a certain business, and to pay a certain rental. We find that during that time no other persons have been in possession but the McKay Brothers, no other persons have been contemplated to be let in—no other persons have been in the building, have occupied it, no other business has been conducted than that provided for. The rents apparently have been paid as provided for, and the persons who are now in are not third persons, as it were, they were the identical persons that Mr. Tierney himself let into possession under this lease, and no third person has been in possession or attempted to be, no direct act of assigning this lease to anybody has been done; there isn't any written instrument that either of these brothers have assigned their interest in the lease to others; they have changed their status toward each other, in conducting the identical business for which this store was leased."

Not only are the facts stated by the court undisputed on this record, but the lease sought to be forfeited does not run to defendants as a partnership. Their designation in the introductory paragraph as co-partners trading under the name of McKay Bros. is but descriptive of the persons who were to be "hereinafter called lessees, as follows:" and thereafter throughout the instrument no mention is made of any partnership. The lease is only signed by them as individuals. As *lessees* of the premises they were

tenants in common with right to possession as such. No private agreement between themselves thereafter as to the business they were engaged in could change their rights or obligations under the lease as to non-participating third parties. While the lease restricts the occupation and use of the premises to a certain line of business, it does not specify the name under which the business shall be conducted nor require them to conduct it as a partnership.

Although they took the lease in their individual names they were in truth partners when and before the lease was made, doing business under an assumed name and legally certified as such in the public records with their individual names as members recorded, the partnership "to continue indefinitely." That public record yet stands unchanged and the permitted business has since continued to be run on the leased premises under the assumed partnership name with one or both of the lessees in charge, at least down to the time of the trial. The statute requiring such record of partnership provides:

"Section 2. In case there shall be at any time after the making and filing of said certificate, any change in the name or style of said firm, or in the time of its existence, then a new certificate, verified as before specified, shall in like manner be filed as required by section one of this act, before such change shall take effect; and until such new certificate shall have been made and filed, as above specified, the individual members of the firm, as set forth in the certificate on file, shall be held to be the actual members of the firm, and in all respects holden and liable for any obligation, debt or liability, incurred by the said co-partnership." 2 Comp. Laws 1915, § 6355.

Private agreements between defendants could not change that law or relieve either of his obligations under the lease or the partnership, as to third parties. Neither would plaintiff's orally recognizing Max as tenant of the premises and accepting rent from him

paid by McKay Bros.' checks necessarily change their legal relations.    Max was his tenant from the beginning and holden to him for rent under the written lease.    There is no proof that either of the tenants ever legally conveyed in writing his interest in the lease to the other.    In Lewis on Law of Leases, 138, it is said:

"Inasmuch as the conveyance of his interest by one of two tenants in common to the other does not introduce a new tenant, it seems consistent with both the letter and the intent of the lease to hold that such a conveyance is not a breach of a condition or joint covenant not to assign."

Assuming that in 1919 Pingree had legally assigned his interest in the lease to Max and plaintiff had waived the covenant against such assignment—

"It is generally held that the waiver of a covenant against assignment without the consent of the lessor or the giving such consent forever discharges and removes the restriction and the term is thereafter assignable by the assignee without the consent of the lessor.    The condition against assignment is regarded as entire and not capable of being waived or released in part."    2 Underhill on Landlord and Tenant, 1059.

It is the general rule which this court has more than once recognized, that the law does not favor forfeitures, provisions for them are to be strictly construed, and to sustain them the proof must be clear and convincing (*Hilsendegen* v. *Hartz Clothing Co.*, 165 Mich. 255; *White* v. *Huber Drug Co.*, 190 Mich. 212; *Miller* v. *Pond*, 214 Mich. 190 [17 A. L. R. 179]). In 2 Taylor on Landlord and Tenant (9th Ed.), § 489, it is said that a forfeiture can only be enforced when there is "such a breach shown as it was the clear intention of the parties to provide for."    Under the wording of this restriction and undisputed facts in the case, it cannot with certainty be said that the

intention of the parties to provide for the breach claimed here is clear and manifest.

For the foregoing reasons the judgment of the lower court will stand affirmed.

McDONALD, C. J., and CLARK, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred. BIRD, J., did not sit.